2014 CO 42

**In the MATTER OF John R. OLSEN.**

**Supreme Court Case No. 13SA33**

Supreme Court of Colorado.

June 2, 2014

Attorneys for Complainant: Office of the Attorney Regulation Counsel, James C. Coyle, Regulation Counsel, Charles E. Mortimer, Jr., Deputy Regulation Counsel, Denver, Colorado.

Attorney for Respondent: John R. Olsen, Pro Se, Niwot, Colorado.

JUSTICE HOBBS delivered the Opinion of the Court.

¶ 1 In this attorney discipline proceeding, we conclude that the Hearing Board's order suspending attorney John R. Olsen for six months with the requirement of reinstatement is unreasonable. The Board found that Olsen had engaged in negligent conduct, not knowing falsehood. Our review of the ABA standards and our prior decisions leads us to conclude that the appropriate sanction against Olsen is public censure rather than suspension. We affirm the Hearing Board's conclusions that Olsen violated Rules of Professional Conduct 3.1 and 8.4(d), but we reverse its imposition of a six-month suspension with the requirement of reinstatement and instead order that Olsen be, and hereby is, publicly censured for his misconduct.

## I.

¶ 2 Olsen was admitted to practice law in Colorado in 1979. The events leading to this disciplinary proceeding stemmed from an unemployment lawsuit Olsen filed on behalf of his client Melissa Mellott in the United States District Court for the District of Colorado in October 2009.[1] Mellott retained Olsen in January 2009 through a pro bono program to represent her in an unemployment claim following her termination from MSN Communications, Inc. ("MSN"). Before agreeing to represent Mellott, Olsen interviewed her and found her to be a highly credentialed engineer. Mellott explained that her husband was an airman stationed at the Air Force Academy in Colorado Springs and that they both had top-secret military clearances due to the nature of their work. Olsen, himself a military veteran, believed her to be credible. Mellott's initial claim for unemployment was successful and she began collecting benefits.

¶ 3 Olsen then filed a complaint in the district court, seeking back pay, equal pay, front pay, and benefits for Mellott. From the outset of the underlying litigation, MSN maintained that Mellott's claims were frivolous. It claimed that Mellott had been employed for substantial compensation since her termination from MSN; that Mellott was fraudulently using another woman's social security number to hide her substantial income while collecting unemployment; that Mellott fabricated documents purporting to authorize her use of a second social security number; and that she lied to the district court by asserting she moved to Germany in the summer of 2010.

### A. Mellott's Claim for Lost Wages

¶ 4 In January and February 2010, MSN discovered that Mellott had been employed since her termination from MSN, and provided Olsen copies of payroll records it had subpoenaed from Blackstone Technology Group ("Blackstone") and Qwest Communications ("Qwest"). Mellott continued to deny that she had been employed "in any capacity." In her April 16, 2010, deposition, Mellott was presented with a W–2 form that contradicted that claim. She asserted that the W–2 was incorrect and denied receiving over $100,000 from Qwest in documented direct-deposited funds. Mellott also denied receiving $51,000 documented by Blackstone. Olsen did not seek to depose Blackstone or Qwest to verify Mellott's version of events. He did claim that he contacted Blackstone's human resources department in an attempt to verify the payroll records and was instructed to obtain a release from Mellott. He did not obtain the release. Olsen also

---

1. A complete summary of the facts of this case could fill volumes. Indeed, the Hearing Board's thorough opinion dedicates nearly twenty pages to summarizing the record of the federal litigation and Olsen's disciplinary proceeding. We highlight in this opinion only the facts most relevant to our decision on the appropriate sanction for Olsen.

contacted Qwest and was told that Mellott was being internally investigated and her wages had been frozen as a result. He took no further steps to verify the Qwest documents.

¶ 5 With its motion to dismiss, filed on June 10, 2010, MSN again provided Olsen with the Qwest and Blackstone records and attached an email exchange between Mellott and a third employer in which she asked it to match Qwest's employment package. Despite being presented with this credible evidence that his client had been untruthful about not working, Olsen's response to MSN's motion to dismiss simply reasserted Mellott's declarations that she had not been regularly employed since March 16, 2010, that she had not received most of the direct-deposited funds from Qwest or Blackstone, and that the companies issued "misleading financial, payroll and paystub documents." Olsen did not supplement Mellott's discovery responses or deposition in light of her shifting narrative of events.

## B. Mellott's Social Security Number

¶ 6 MSN also discovered evidence that Mellott was using another woman's social security number ("SSN") and presented it to Olsen in the early stages of litigation. When questioned during discovery about her use of two SSNs, Mellott first claimed that she had been given a "temporary verification number" which was "linked" to her actual SSN. She submitted a document purportedly assigning her a "temperary" number (the word "temporary" was misspelled three times in the document), and Olsen never questioned its authenticity. During her deposition in April 2010, Mellott advanced a second theory to justify her use of the second SSN. When asked if she was familiar with Sandra Prince, a Florida resident whose SSN was identical to the number Mellott had submitted to Blackstone and Qwest, she claimed Blackstone had somehow erred in entering her information when preparing its I–9 form, mistakenly generating Prince's records. Olsen later testified that he believed Mellott was merely "confused," rather than dishonest, during her deposition.

¶ 7 In its June 10, 2010, motion to dismiss, MSN claimed Mellott had committed social security fraud. Olsen responded on August 2, 2010, and claimed MSN's motion lacked basis in fact and was frivolous, and he attacked MSN's counsel's motives. He submitted a notarized declaration by Mellott and documents ostensibly authorizing her to use the other SSN. Olsen also attached his own declaration describing his personal knowledge of military security clearances (which Mellott claimed both she and her husband had) and advanced Mellott's improbable theory for why she had used two SSNs. On August 12, 2010, MSN requested that Mellott authorize the Social Security Administration to release her records. Olsen opposed the request because, by that point, the district court had stayed discovery in the case in connection with MSN's June 10, 2010, motion to dismiss.

¶ 8 Olsen later claimed that he had visited the Social Security Administration Office in Boulder on two occasions to try to confirm Mellott's SSN, but he was again unable to obtain information without a release from Mellott. He did not obtain the release. Olsen also claimed to have made efforts to investigate Sandra Prince's SSN, but stated that she refused to cooperate. During December 2010 hearings before Colorado Federal District Court Judge Philip Brimmer, a Social Security Administration supervisor testified that the SSN in question was not associated with Mellott, that the document Mellott submitted listing her "temperary" verification number was not a form the agency uses, and that it never issues temporary numbers. Rather than question his client's inconsistent versions of events, Olsen instead claimed that the supervisor was "ignorant" and suggested she lied on the stand. Olsen did not withdraw his assertion that Mellott was legally entitled to use the SSN in question.

## C. Claim that Mellott Relocated to Germany

¶ 9 Mellott's case began to unravel in earnest in summer 2010. In a July 29, 2010, motion for a forthwith hearing, Olsen notified the district court that Mellott had moved to

Germany because she had been assigned to "another sensitive role in the military." On August 8, 2010, MSN filed a motion for attorney's fees and costs, asserting that Mellott was not in Germany. Olsen requested additional time to respond to MSN's motion, claiming it was difficult for Mellott to gather her "documents" and she did not have "scanning or FAXing ability from Germany (at her home)." Olsen's September 1, 2010, response attached Mellott's declaration that she had moved, a copy of her heavily redacted bank records allegedly listing transactions she made in Germany in July 2010, and Olsen's own declaration that his client had moved. Olsen declared under oath that the bank records were valid and that he called his client on a German telephone number using German operator assistance.

¶ 10 That same day, Olsen contacted Mellott's husband's boss, Major Williams, to confirm the Mellotts' relocation to Germany and Williams responded that Mr. Mellott had not been relocated. Olsen decided to disregard Major Williams' statement based on the fact that the Major had previously denied Mellott had ever been employed by the Air Force, and Mellott had told Olsen otherwise.[2] Olsen also claimed to have spoken to a "receptionist" for Mr. Mellott's unit, who told him Mr. Mellott "was somewhere on the East Coast"—a statement that Olsen inexplicably decided meant Mr. Mellott had been reassigned to another country.

¶ 11 Magistrate Judge Michael J. Watanabe set a hearing for October 27, 2010, and ordered Mellott to bring the passport she allegedly used while in Germany. Olsen filed a motion to continue the hearing and submitted another notarized declaration from Mellott attesting to her relocation, but the motion was denied. On October 26, 2010, Olsen moved to dismiss the case, asserting that Mellott could not afford to fly to Denver from Europe and was seeking employment overseas. At the October 27th hearing, an MSN employee testified that he had seen Mellott working at the offices of Dish Network on October 25, 2010, and had taken a

photo with his cell phone of her working there. Olsen did not cross-examine the employee. Mellott's husband testified that he had seen her that very morning, that she was currently employed, and that she decided to work rather than attend the hearing. Mr. Mellott further testified that he had not been reassigned and neither he nor his children had been in Europe during the previous three months. Olsen later claimed that, while he was "stunned" by Mr. Mellott's testimony, he ultimately believed that Mr. Mellott was lying to somehow protect his wife and children, or alternatively, that he refused to acknowledge that he had been in Europe because of his top-secret operations.

¶ 12 The court granted Olsen's motion to dismiss on October 29, 2010, and granted MSN leave to file an updated motion for attorney's fees and costs. Two days later, Olsen requested permission to retract certain assertions that both he and Mellott had made regarding her move to Germany, which he finally concluded were false. On November 5, 2010, MSN filed a motion to compel the disclosure of attorney-client communications pursuant to the crime/fraud exception to attorney-client privilege on the grounds that Mellott and Olsen had conspired to commit social security fraud.

¶ 13 On November 23, 2010, MSN filed a second motion for attorney's fees and costs. On December 8, 2010, Magistrate Judge Watanabe issued an order directing Mellott to surrender her passport and concluding that statements made by Olsen and Mellott about her move to Germany were indeed false. Judge Brimmer held a hearing on December 21, 2010, on MSN's second motion for attorney's fees and costs and the crime/fraud motion, and on September 30, 2011, Judge Brimmer issued an order granting MSN's second motion for attorney's fees and denying the crime/fraud motion.

¶ 14 Judge Brimmer determined that Mellott lied under oath and in response to discovery requests by (i) stating that she was

---

2. On September 20, 2010, Major Williams submitted a revised affidavit confirming that Mellott had indeed been employed as a "recreational specialist" with the Air Force for a brief period

in 1999. This description differed from Mellott's and Olsen's assertions that she was required to have "top-secret" clearance for her job.

not working since being terminated from MSN, when in fact she had secured several lucrative jobs; (ii) lying about her use of two SSNs; and (iii) giving "preposterous testimony" about relocating to Germany and using a British-issued passport. Judge Brimmer also determined that Olsen should have been skeptical of his client's increasingly implausible contentions and that he had no basis to continue pursuing her original claims after MSN presented credible evidence that she was lying. Judge Brimmer concluded that Olsen' s conduct "exceeded mere objective unreasonableness" and sanctioned Mellott and Olsen each $25,000 pursuant to 28 U.S.C. § 1927 (2012). The sanction was also based on Judge Brimmer's finding that Olsen unreasonably multiplied the proceedings and reaffirmed false statements made by Mellott.

### D. Disciplinary Proceeding

¶ 15 The Office of Attorney Regulation filed a complaint against Olsen in February 2012, alleging he violated several Colorado Rules of Professional Conduct in connection with his representation of Mellott. Prior to his disciplinary hearing, Olsen filed multiple motions to disqualify Presiding Disciplinary Judge Lucero, all of which were denied as meritless.[3] After the disciplinary hearing, Olsen filed two additional motions for a mistrial, both of which were largely unsupported and were denied. The Hearing Board issued its Opinion and Decision Imposing Sanctions on December 17, 2012, concluding that the appropriate sanction for Olsen' s misconduct was a six-month suspension with the requirement of reinstatement. The Hearing Board granted Olsen' s motion for a stay of the suspension pending this appeal with the condition that he undergo practice monitoring and choose an appropriate practice monitor in consultation with Attorney Regulation. Olsen defied the latter condition by proposing three unsuitable practice monitors—his wife, his son, and a former employee—before Judge Lucero finally ordered him to select one from a list of neutral attorneys. Olsen' s practice monitor has since submitted periodic reports attesting to his compliance with their Practice Monitoring Plan.

## II.

¶ 16 We affirm the Hearing Board's conclusions that Olsen violated Rules of Professional Conduct 3.1 and 8.4(d), but we reverse its imposition of a six-month suspension with the requirement of reinstatement and instead order that Olsen be, and hereby is, publicly censured for his misconduct. We begin with an analysis of Olsen' s violations of Rules 3.1 and 8.4(d) and then evaluate the proper sanction in light of the ABA Standards, our prior disciplinary decisions, and the specific facts of this case.

### A. Standard of Review

¶ 17 This Court has exclusive jurisdiction over lawyers and possesses the plenary authority to regulate and supervise the practice of law in Colorado. *See* C.R.C.P. 251.1(d); *In re Cardwell*, 50 P.3d 897, 904 (Colo.2002) (citing *People v. Varallo*, 913 P.2d 1, 3 (Colo.1996)). We will affirm a sanction imposed by the Hearing Board unless we determine that the form of discipline bears no relation to the conduct, is manifestly excessive or insufficient in relation to the needs of the public, or is otherwise unreasonable. C.R.C.P. 251.27(b); *In re Roose*, 69 P.3d 43, 46 (Colo.2003). We are bound by the Hearing Board's findings of fact, including its credibility determinations, unless they are not supported by substantial evidence in the record. *In re Rosen*, 198 P.3d 116, 119 (Colo.2008); *In re Haines*, 177 P.3d 1239, 1244 (Colo.2008). We review its decisions to characterize particular facts as aggravating or mitigating and its ultimate sanction de novo. *See* C.R.C.P. 251.27(b); *see also In re Hickox*, 57 P.3d 403, 404 (Colo.2002).

¶ 18 We have consistently recognized the ABA Standards for Imposing Lawyer Sanctions (1986 & Supp. 1992) as the guiding authority in Colorado for selecting an appropriate sanction for an attorney in a disciplin-

---

**3.** Olsen attempts to revive this recusal argument on appeal, claiming that the fact that Judge Lucero and Judge Brimmer were formerly employed as Assistant U.S. Attorneys together renders Judge Lucero biased in the present case. Olsen provides no legal authority to support this assertion and we are not convinced by his arguments.

ary proceeding. *See In re Attorney D.*, 57 P.3d 395, 399 (Colo.2002). The purpose of the Standards is to foster consistency and fairness in the imposition of sanctions. *See* ABA Standards, Preface. The Standards lay out a range of suggested sanctions for each type of misconduct and require disciplinary bodies to consider the duty that was violated, the attorney's mental state, and the actual or potential injury caused by the attorney's misconduct. ABA Standards 3.0; *Roose*, 69 P.3d at 47. The Standards also require consideration of aggravating or mitigating factors that may enhance or reduce the presumptive sanction for an offense. *Id.* In evaluating the reasonableness of a sanction, we also consider our prior disciplinary decisions, though we have cautioned that a meaningful comparison between cases is challenging and each case must be decided according to its unique facts. *In re Attorney F.*, 285 P.3d 322, 327 (Colo.2012).

## B. Hearing Board Findings on Rule Violations

¶ 19 After receiving briefing, conducting a formal hearing, and taking testimony from several witnesses, the Board concluded that Olsen violated two rules of Professional Conduct. It concluded that he violated Rule 3.1 by advancing three frivolous arguments on behalf of his client in the underlying federal litigation: (i) Mellott's claim for lost wages; (ii) Mellott's theories for why she used multiple SSNs; and (iii) that Mellott had moved to Europe and was unavailable to appear in person for several hearings before the federal magistrate and district court judges. The Board also concluded that Olsen violated Rule 8.4(d) by engaging in protracted and unnecessary litigation that wasted considerable judicial resources and prejudiced the administration of justice. We agree with the Board's conclusions that Olsen violated Rules 3.1 and 8.4(d).

¶ 20 Rule 3.1 states, in pertinent part: "A lawyer shall not bring or defend a proceeding, or assert or controvert an issue therein, unless there is a basis in law and fact for doing so that is not frivolous, which includes a good faith argument for an extension, modification or reversal of existing law." We interpret Rule 3.1 broadly to include all proceedings in which factual and legal contentions are made, including post-trial and disciplinary proceedings. An objective standard is used to determine whether an attorney's claim is frivolous. *See* Colo. RPC Preamble cmt. 20 ("[The] Rules ... establish standards of conduct by lawyers ... a lawyer's violation of a Rule may be evidence of [a] breach of the applicable standard of conduct."). While an attorney is permitted to rely on factual accounts given by a client, it may not be objectively reasonable to continue to rely exclusively on a client's statement of facts when the attorney is presented with credible contradictory evidence. *See* Colo. RPC 3.1 cmt. 2 ("What is required of lawyers ... is that they inform themselves about the facts of their clients' cases ... and determine that they can make good faith arguments in support of their clients' positions.").

¶ 21 The Board found that Olsen advanced his client's frivolous arguments first in the underlying federal lawsuit, and again in the post-trial proceedings concerning attorney fees and other sanctions. The Board reasoned that "it should have been obvious to [Olsen] that [his client's] shifting narratives were completely contradicted by credible evidence" and also that there was a "dearth of credible evidence indicating that [Olsen] conducted a reasonable investigation of his client's implausible factual assertions."

¶ 22 We agree that Olsen had an ongoing professional duty to independently assess the factual and legal bases for Mellott's claims. At the same time, we recognize that an attorney's role is to advocate for the client. The dissenting Hearing Board member correctly observes that an attorney has a duty of loyalty to the client, along with a duty of candor to the court, and attorneys should generally resolve doubts about the factual underpinnings of a claim in favor of their clients.

¶ 23 Nevertheless, Rule 8.4(d) states, in pertinent part: "It is professional misconduct for a lawyer to ... engage in conduct that is prejudicial to the administration of justice." The record before us contains ample evidence that Olsen's conduct prejudiced the administration of justice in the underly-

ing federal lawsuit. His unprofessional demeanor in dealing with opposing counsel, Judge Brimmer, and Magistrate Judge Watanabe exceeded the bounds of acceptable litigation strategy and evidenced a disregard for his professional responsibility to the tribunals. As a result of Olsen's pursuit of his client's frivolous arguments, Judge Brimmer and Magistrate Judge Watanabe were each required to expend significant judicial resources scheduling, preparing for, and continuing hearings, and ruling on Olsen's repetitive and often unsupported motions. For these reasons, there is adequate evidence in the record to uphold the Board's conclusion that Olsen violated Rule 8.4(d).

¶ 24 We conclude it to be significant, however, that the Board disagreed with the People's contention that Olsen violated Rule 3.3(a)(3) [4] by knowingly offering false evidence in the underlying litigation and failing to take reasonable remedial measures in the district court.[5] The Board properly interpreted Rule 3.3(a)(3) as requiring an attorney's actual knowledge that evidence is false before the duty to take remedial measures is triggered. *See* Colo. RPC 3.3 cmt. 8. Because the Board could not find that Olsen actually knew his client was lying, only that he "should have known … that his client's statements and documents were false," it concluded that he did not have the requisite mental state—knowledge—for a Rule 3.3(a)(3) violation. Likewise, the Board found that the People had failed to offer sufficient evidence that Olsen violated Rule 8.4(c).[6] The prohibition against offering false evidence makes clear that a lawyer's "reasonable belief" the evidence is false does

not necessarily preclude its presentation to the trier of fact. Colo. RPC 3.3 cmt. 8. Again, the Board found Olsen's mental state to be negligent but not knowing.

### C. Sanction

#### 1. Duty, Mental State, and Injury Caused

¶ 25 Having found violations of Rules 3.1 and 8.4(d), the Board properly proceeded to apply the ABA Standards to Olsen's misconduct to arrive at a presumptive sanction. *See* ABA Standard 3.0; *In re Attorney F.*, 285 P.3d 322, 326 (Colo.2012) (prescribing a "flexible" two-step inquiry into the duty owed, the attorney's mental state, and the injury caused, followed by consideration of aggravating and mitigating factors). The Board concluded that Olsen violated a duty to the legal system by "persistently advancing three frivolous claims without basis in fact and by failing to adequately investigate his client's factual assertions." As discussed above, it concluded that his mental state was negligent, but not knowing, in that he "failed to heed a substantial risk that his advancement of [his client's] claims would cause harm to opposing counsel and the legal system."[7] Last, the Board concluded that Olsen caused injury to the legal system and opposing counsel by wasting judicial resources and "prolonging the underlying litigation unnecessarily." There is sufficient evidence in the record to support the Board's conclusions on Olsen's duty, mental state, and the causation of injury.

---

4. Colo. RPC 3.3(a)(3) states, in pertinent part: "A lawyer shall not *knowingly* offer evidence that the lawyer knows to be false. If a lawyer, the lawyer's client, or witness called by the lawyer has offered material evidence and the lawyer comes to know of its falsity, the lawyer shall take reasonable remedial measures, including, if necessary, disclosure to the tribunal." (emphasis added).

5. We note that the People did not cross-appeal on the Rule 3.3(a)(3) and 8.4(c) violations. We include this discussion for the purpose of comparing the requisite mental state for a violation of each of the Rules Olsen was alleged to have violated.

6. Colo. RPC 8.4(c) states, in pertinent part: "It is professional misconduct for a lawyer to … engage in conduct involving dishonesty, fraud, deceit or misrepresentation[.]"

7. Negligence is defined as "the failure of a lawyer to heed a substantial risk that circumstances exist or that a result will follow, which failure is a deviation from the standard of case that a reasonable lawyer would exercise in the situation." ABA Standards § 3 Definitions. Knowledge is defined as "the conscious awareness of the nature or attendant circumstances of the conduct but without the conscious objective or purpose to accomplish a particular result." *Id.*

## 2. ABA Aggravating and Mitigating Factors

¶ 26 Turning to the sanction for Olsen's misconduct, Standards 6.1 and 6.2 identify public censure as the presumptive sanction against a lawyer who is either negligent in determining whether statements or documents are false, or negligently brings a frivolous claim and causes injury to a party and interference with a legal proceeding. This presumptive sanction may be increased or decreased in light of aggravating and mitigating factors, as well as in light of our decisions in past disciplinary cases. *In re Attorney F.*, 285 P.3d at 326.[8] We review the Board's analysis of aggravating and mitigating factors de novo and will generally uphold its sanction unless we determine it to be unreasonable. *See* C.R.C.P. 251.27(b); *see also Hickox*, 57 P.3d at 404.

¶ 27 The Board considered five aggravating factors, one mitigating factor, and one additional factor to which it gave no weight. The aggravating factors the Board considered were:

- 9.22(c): Pattern of Misconduct—The Board applied "substantial weight" to the fact that Olsen had engaged in similar misconduct in a separate client matter around the same time, for which he was privately censured;

- 9.22(d): Multiple Offenses—The Board found that Olsen committed three separate violations of Rule 3.1 and one violation of Rule 8.4(d);

- 9.22(f): Deceptive Practices During the Disciplinary Process—The Board applied "substantial weight" to its finding that Olsen deceptively cross-examined a witness at the disciplinary hearing and frequently misrepresented evidence in his briefs, motions, and testimony;

- 9.22(g): Refusal to Acknowledge Wrongful Nature of Conduct—The Board applied "substantial weight" to the fact that Olsen has repeatedly "refused to acknowledge the obvious or take any responsibility for his actions," has "completely discounted any facts at odds with [his client's] version of events," and "failed to acknowledge his role in advancing frivolous claims"; and

- 9.22(i): Substantial Experience in the Practice of Law—The Board noted that Olsen has been a practicing attorney licensed in the State of Colorado since 1979 and has substantial litigation experience.

The single mitigating factor the Board considered was 9.32(k): Imposition of Other Penalties, in light of the $25,000 sanction Olsen had paid to the federal district court as of the date of the Board's decision. The People initially conceded one additional mitigating factor, 9.32(e): Full and Free Disclosure to Panel or Cooperative Attitude During Proceedings, but the Board later gave no weight to this factor because of its belief that Olsen engaged in deceptive conduct at the disciplinary hearing. After weighing these factors and considering our prior disciplinary decisions, the Board determined that Olsen's presumptive sanction of public censure should be increased to a six-month suspension with the requirement of reinstatement.

¶ 28 We conclude that increasing Olsen's sanction from public censure to a six-month suspension with the requirement of reinstatement is unreasonable. The Board found that Olsen had engaged in negligent conduct, not knowing falsehood. Our review of the ABA standards and our prior decisions leads us to conclude that the appropriate sanction against Olsen is public censure rather than suspension.

¶ 29 While an attorney's mental state is not a practicing dispositive of the appropriateness of any particular sanction, our prior

---

8. We have cautioned that this framework is not designed to propose a specific sanction for each of the unique fact patterns in cases of attorney misconduct, and that sanctions imposed must reflect the circumstances of each individual case. *See id.* (citing *Rosen*, 198 P.3d at 121).

decisions have generally imposed harsher sanctions for knowing or intentional ethical violations than for negligence. *See People v. Cain,* 957 P.2d 346, 347 (Colo.1998) ("The lawyer's mental state at the time of the misconduct is [a] critical difference between suspension and reprimand."); *compare People v. Haase,* 781 P.2d 80 (Colo.1989) (imposing a six-month suspension for an attorney's obstruction of the discovery process, including intentional collusion with clients and expert witness to conceal discoverable facts unfavorable to their case) *with People v. Thomas,* 925 P.2d 1081 (Colo.1996) (imposing public censure for an attorney's filing of frivolous motions, failure to cooperate with the disciplinary investigation, and making false statements concerning the qualifications and integrity of a judge). We determine it to be significant that the Board was unable to find that Olsen *knowingly* violated any rules, but that he was merely negligent in his failure to adequately investigate the factual underpinnings of his client's claims.

¶ 30 Olsen goes further and argues that his due process rights were violated because only two of the three Board members found him to be negligent, and thus he should not be subject to any sanction in this case. He claims that the imposition of a disciplinary sanction is akin to imposition of a criminal penalty and imposing a sanction against him required a unanimous vote. An attorney discipline case is not a criminal case and a lawyer's procedural due process rights do not mirror those of a criminal defendant. *People v. Smith,* 937 P.2d 724, 727 (Colo. 1997); *accord Varallo,* 913 P.2d at 3 ("A lawyer in a disciplinary proceeding is entitled to procedural due process, although there is no requirement that the lawyer be afforded the same constitutional safeguards as in a criminal trial.") (citations omitted). The Rules of Civil Procedure expressly provide for a valid sanction imposed by only two Board members. C.R.C.P. 251.19(a) ("Within 56 days (8 weeks) after the hearing, the Hearing Board shall prepare an opinion setting forth its findings of fact and its decision ... [t]he opinion shall be signed by each concurring member of the Hearing Board. Two members are required to make a deci-

sion."). Therefore, we are not required to overturn Olsen' s sanction due to the mere existence of the dissent in this case and, as stated above, there is adequate evidence in the record to support Olsen' s Rule 3.1 and 8.4(d) violations. Instead, where we disagree with the Board concerns the weight it gave to certain aggravating factors, which it ultimately used to increase his sanction from public censure to suspension.

¶ 31 First, we conclude that the Board applied too much weight to the aggravating factor that Olsen committed four distinct ethical violations. While Olsen did advance three distinct and frivolous arguments in the underlying litigation, and thus his actions constituted at least one violation of Rule 3.1, the record shows that the basis for all three of the frivolous claims was a pattern of lies and deception that originated with Olsen' s client, not Olsen himself. As the dissenting Hearing Board member pointed out, "the facts showing that [Olsen' s client] was lying did not reveal themselves in a continuous manner," which complicates identifying the exact point at which Olsen should have recognized each claim was frivolous. A claim may appear to be meritorious at the outset of a case, only to be revealed as factually unsupported later on. We determine that Olsen' s Rule 3.1 violation is more appropriately characterized as a single violation arising from the ongoing pattern of untruths of his client, rather than three distinct violations.

¶ 32 Second, we disagree with the Board's attribution of "substantial weight" to the aggravating factor of Olsen' s pattern of misconduct. Olsen was privately censured for similar misconduct around the same time he was representing Mellott. At his disciplinary hearing, Olsen moved for a mistrial when Attorney Regulation Counsel sought to offer into evidence a sealed envelope containing the record of his private censure. It was offered for the Board to consider as an aggravating factor *only if* it found Olsen had violated the Rules of Professional Conduct in the present case. Olsen claims this was an "improper procedure" that was "extremely prejudicial" to him. Though Judge Lucero

properly denied Olsen' s motions for a mistrial because conditional admission of such evidence is consistent with the ABA Standards, *see People v. Sather,* 936 P.2d 576, 579 (Colo. 1997), we are not convinced that a single instance of prior discipline, without more, deserves greater than average weight.

¶ 33 We also decline to apply such "substantial weight" to what the Board viewed as Olsen' s deceptive practices during the disciplinary process. The primary basis [9] for the Board's application of substantial weight to this factor was its conclusion that Olsen engaged in deceptive cross-examination of a People's witness about the location of the Boulder-area Social Security Administration ("SSA") office. The Board concluded that Olsen' s cross-examination "strongly implied" that there are two SSA locations in Boulder and that he had visited a different location from the witness—presumably to undermine the witness's credibility and to bolster his own credibility about the diligence of his independent investigation of his client's claims. The Board took judicial notice of the existence of a single Boulder SSA office pursuant to C.R.E. 201 and Olsen claimed that this violated his due process rights because he did not have an opportunity to respond. While we disagree with Olsen' s argument that his due process rights were violated, we do recognize his right to confront and aggressively cross-examine the witnesses against him in a disciplinary proceeding. We resolve the issue of Olsen's perceived deceptive cross-examination of witnesses in the disciplinary hearing in favor of Olsen.

¶ 34 In sum, our review of the Board's application of ABA aggravating factors to Olsen' s case has led us to conclude that several of these factors—his multiple offenses, his pattern of misconduct, and his perceived deceptive practices during the disciplinary process—were given undue weight. The Board's decision to increase his presumptive sanction of public censure to a six-month suspension was based, in large part, on these aggravating factors.

¶ 35 The primary purpose of lawyer regulation proceedings is to protect the public, not to punish the offending lawyer. *Cardwell,* 50 P.3d at 904 ("[W]e have made it clear that the primary purpose of attorney discipline is to protect the public, not to punish the offending lawyer."). On balance, we conclude that the more reasonable sanction against Olsen is the presumptive sanction for negligent violations of Rules 3.1 and 8.4(d)—public censure—rather than suspension.

¶ 36 We observe that Judge Lucero granted a stay of Olsen' s suspension pending this appeal, concluding that the public would be adequately protected by Olsen undergoing practice monitoring until we issued our decision.[10] *See* C.R.C.P. 251.27(h) (favoring the grant of a stay pending appeal unless the public will not be adequately protected). Olsen' s practice monitor has observed no further violations of the Rules of Professional Conduct during the pendency of this appeal. If Olsen again engages in conduct that vio-

9. While Olsen' s deceptive cross-examination of the People's witness about the Boulder SSA office was the *primary* basis for its application of substantial weight to this factor, we acknowledge that the Board cited other incidents—his cross-examination of opposing counsel from the federal litigation and his misrepresentation of evidence pertaining to his client's SSN—as additional evidence of Olsen' s deceptive conduct. While the record generally supports these findings, we still conclude that the Board erred in applying "substantial" weight to this aggravating factor.

10. The Board issued its opinion on the merits on December 17, 2012, holding in part that Olsen' s deceptive conduct during the disciplinary proceedings was an aggravating factor supporting a six-month suspension. This perceived "decep-

tive conduct," as discussed above, included Olsen' s cross-examination of a People's witness about the location of the Boulder-area SSA office. On February 14, 2013, Judge Lucero granted Olsen' s motion for a stay of his six-month suspension pending this appeal. On July 17, 2013, the People filed a motion to lift the stay and immediately activate Olsen' s suspension on the grounds that Olsen again deceptively asserted the existence of two SSA offices in his opening brief to this Court. Olsen argues that Judge Lucero somehow "reversed himself" when he denied the Peoples' motion to lift the stay. In denying the motion, Judge Lucero did nothing to affect the merits of the Board's decision. We are unpersuaded by Olsen' s argument that Judge Lucero reversed himself, and we reaffirm Judge Lucero's authority to enter such orders pursuant to C.R.C.P. 251.19(c).

lates the Rules, a more severe sanction than public censure would be available in a future disciplinary proceeding.

### III.

¶ 37 We affirm the Hearing Board's conclusions that Olsen violated Rules of Professional Conduct 3.1 and 8.4(d), but we reverse its imposition of a six-month suspension with the requirement of reinstatement. We hereby censure John R. Olsen for his misconduct.