The PEOPLE of the State of
Colorado, Complainant,

v.

Gary Alan BOTTINELLI, Attorney–
Respondent.

No. 95SA252.

Supreme Court of Colorado,
En Banc.

Oct. 28, 1996.

---

Linda Donnelly, Disciplinary Counsel, John S. Gleason, Assistant Disciplinary Counsel, Denver, for Complainant.

Gary Alan Bottinelli, Morrison, pro se.

PER CURIAM.

This is a lawyer discipline case. A hearing panel of the supreme court grievance committee approved the factual findings and conclusions of a three-member hearing board that the respondent had violated the Code of Professional Responsibility. A majority of the hearing board recommended that the respondent be suspended from the practice of law for two years, although the presiding officer considered disbarment to be the appropriate sanction. The panel modified the board's recommendation of discipline to a recommendation that the respondent be disbarred, for the reasons advanced by the presiding officer of the board and by the assistant disciplinary counsel in his objections to the two-year suspension proposed by the board. As detailed below, we accept the hearing board's findings and the panel's recommendation. We therefore order that the respondent be disbarred.

I.

The respondent was admitted to the Colorado bar in 1972. The charges of misconduct against him all arise from the respondent's participation as counsel in a probate case in El Paso County for the guardianship and conservatorship of Ruth Claire Otterpohl. *See In re Otterpohl,* No. 90PR0356 (El Paso County Dist. Ct.), *aff'd,* No. 91CA1592 (Colo. App. Aug. 11, 1994) (not selected for publication). The hearing in this disciplinary proceeding lasted four days, and the record that the board examined exceeded 2,400 pages. After considering the testimony of the complainant's witnesses and the respondent's witnesses, including the respondent himself, as well as the exhibits admitted into evidence, the hearing board concluded that the following had been established by clear and convincing evidence.

II. General Factual Findings

In 1990, then seventy-four-year-old Ruth Otterpohl was diagnosed by her treating physicians as suffering from depression and dementia. Otterpohl's only daughter, Kathleen Jenson, hired attorney Robert Fisher, in May 1990, to petition the El Paso County Probate Court for guardianship and conservatorship of her mother. Before filing the petition, Kathleen Jenson had placed her mother in a nursing home.

Also in May of 1990, Karen Constantini, one of Kathleen Jenson's children, and thus Otterpohl's granddaughter, removed her grandmother from the nursing home and took her to Colorado Springs and began living with her.

The probate matter was originally assigned to Commissioner (now Magistrate) E. David Griffith. The commissioner appointed Tristan Bonn as the guardian ad litem. Commissioner Griffith initially recused himself when he became aware that Kathleen Jenson's lawyer, Robert Fisher, was associated as counsel for the plaintiff in a personal injury case in which Griffith was a defendant. The probate case was reassigned to El Paso County Court Judge Rebecca Bromley, who routinely handled probate matters as acting district court judge when necessary. Jenson later became dissatisfied with Fisher, discharged him, and hired the respondent.

The respondent filed a motion for continuance of the competency hearing, which was set for September 1990, since the setting was less than thirty days away when he was retained. At the hearing on the motion for continuance, Otterpohl's lawyer, Jack Scheuerman, called Jenson's former lawyer, Fisher, to testify. Scheuerman and Fisher had previously discussed that Fisher would be called. At the hearing, Fisher passed a note to Scheuerman and sat beside Otterpohl's granddaughter Karen Constantini, who was opposing her mother on the issue of Otterpohl's competency. Judge Bromley denied the respondent's motion for continuance, and the hearing on Otterpohl's competency remained set for September 24–26, 1990.

The probate court had appointed Arthur Roberts, M.D., to evaluate Otterpohl, and on or about June 14, 1990, Dr. Roberts issued a written report to the probate court, stating that in his opinion Otterpohl was doing significantly better and was no longer incompetent. The respondent sought a second medical evaluation by one of Otterpohl's treating physicians, but Judge Bromley instead appointed Scott Sickbert, M.D., to conduct a second evaluation on behalf of the court. Dr. Sickbert also found Otterpohl competent.

Because Fisher had withdrawn, the underlying reason for the commissioner's disqualification no longer applied, so the case was again assigned to Commissioner Griffith, who presided at the September 24–26, 1990, hearing. During the hearing, Dr. Sickbert examined Otterpohl again and testified that she was competent, as did Dr. Roberts.

The respondent questioned Otterpohl regarding statements she had made to Dr. Roberts concerning the size of her estate. Commissioner Griffith interrupted the proceedings and chastised the respondent in chambers for what the commissioner believed was an attempt to trick the elderly woman. During the respondent's questioning of Otterpohl, he also showed her a teddy bear which had a very strong emotional significance for her.

At the conclusion of the hearing, Commissioner Griffith found Otterpohl competent, and the case was continued until December 1990 to determine the reasonable attorney fees to be paid by the Otterpohl estate and to address certain other matters, including whether Jenson should restore to Otterpohl any property or funds taken from her accounts. To aid in the determination of the attorney fee questions and the appropriateness of deducting the fees from the Otterpohl estate, the commissioner appointed Clifton Kruse as a "special guardian ad litem." Kruse recommended that none of the attorney fees submitted by the respondent or his client be awarded against the estate. Kruse also recommended that the court assess fees against the respondent and his client Kathleen Jenson for maintaining frivolous and groundless positions in the proceedings.

After the competency hearing in September, and before the December hearing, the respondent submitted approximately 100 interrogatories to Otterpohl's counsel, Scheuerman. The latter filed objections to most of the interrogatories on the ground that the majority of them concerned issues already determined in the September hearing. The respondent then filed a motion to compel and a motion for sanctions without complying with C.R.C.P. 121 § 1–12(5) (requiring lawyer to consult with opposing counsel prior to filing motion to compel discovery). The probate court granted the motion in part and denied it in part, ruling that Otterpohl was required to answer only a few of the respondent's interrogatories because the rest addressed issues already resolved in September.

Robert Fisher filed a complaint in the Otterpohl probate matter on or about October 3, 1990, for attorney fees and costs against Kathleen Jenson and her husband, Kenneth Jenson. The respondent filed an answer and a counterclaim for professional malpractice against Fisher on behalf of the Jensons.

During the course of the proceedings, the respondent filed numerous motions alleging a conspiracy among Commissioner Griffith, Judge Bromley, El Paso County District Court Judge Donald Campbell, and various Colorado Springs lawyers, against his clients.

On or about June 19, 1991, District Court Judge Campbell found that the respondent and his clients, the Jensons, had resisted the efficient closing of the Otterpohl estate. The court therefore entered judgment against the respondent and his clients, jointly and severally, in the amount of $7,122.75 in attorney fees and costs. Then, by order dated August 14, 1991, the court also assessed reasonable attorney fees against the respondent's client Kathleen Jenson in the amount of $4,595.82. It also assessed fees against Kathleen Jenson and the respondent in the amount of $20,356.18. Finally, the court assessed the respondent and Jenson for the fees of the special guardian ad litem, Clifton Kruse, in the amount of $1,165.30. As of the date of the hearing in this discipline case, the re-

spondent has not paid anything in satisfaction of these judgments.

## II. Conclusions of the Hearing Board
### A.

With respect to Count I of the formal complaint, the hearing board concluded that eighteen of the interrogatories propounded by the respondent to Otterpohl "were posed merely to harass individual parties to the proceeding, which [the respondent] knew were not relevant to the case, and which were intended to degrade a witness." This conduct violated DR 7–102(A)(1) (in representing a client, a lawyer shall not file a suit, assert a position, conduct a defense, delay a trial, or take other action on behalf of the lawyer's client when the lawyer knows or when it is obvious that such action would serve merely to harass or maliciously injure another); and DR 7–106(C)(2) (in appearing before a tribunal, a lawyer shall not ask any question that the lawyer has no reasonable basis to believe is relevant to the case and that is intended to degrade a witness or other person).[1]

### B.

Regarding Count II of the complaint, the hearing board found that the respondent repeatedly made false accusations of judicial misconduct against Commissioner Griffith, Judge Bromley, and Judge Campbell. For example, the respondent filed a motion in the probate proceeding entitled, "Motion for Stay of Order Dated February 5, 1991, and for Stay of Hearing Scheduled for April 11, 1991, Pending Application for Writs Pursuant to C.A.R. 21, to the Colorado Supreme Court, and Order of Stay." In the motion, the respondent alleged that

> Kathleen Jenson's efforts to protect her Mother from being falsely imprisoned and undly [sic] influenced by Karen Constantini have been thwarted by repeated acts of judicial misconduct by the Honorable Donald E. Campbell, the Honorable Rebecca Bromley, and Commissioner E. David Griffith, including the participation by all said judges and commissioner in approximately fifteen ex parte meetings with attorneys opposed to Kathleen Jenson in the instant cause. . . .

At the disciplinary hearing, Commissioner Griffith and Judges Bromley and Campbell testified that they did not engage in ex parte conversations with any of the lawyers or litigants in the probate matter, except for a few scheduling discussions the hearing board determined were not improper and which provided the respondent with no basis for the charges in his motion.

The respondent also filed a "Petition for Relief in the Nature of Mandamus, Prohibition and Habeas Corpus Pursuant to C.A.R. 21" in *Jenson v. District Court,* No. 91SA65 (Colo. filed Feb. 21, 1991). The petition claimed that "[m]embers of [a forensic] network conspired to deny Kathleen Jenson a fair trial." This so-called

> forensic network [was] comprised of the following individuals in the community of

---

1. In connection with Count I, the hearing board determined that the following alleged disciplinary violations had not been established by clear and convincing evidence: that the respondent accused Jack Scheuerman of forging a document or filing a forged document; and that the respondent improperly questioned Otterpohl about her prior statements regarding her net worth.

In fact, the board concluded that at the September 1990 hearing the respondent did not assert positions or take other actions merely to harass individual parties or their counsel, nor did he repeatedly ask improper questions that he knew were not relevant or were intended to degrade a witness; that the respondent's display of the teddy bear during his questioning of Otterpohl did not amount to a violation of the disciplinary rules; that some of the respondent's specific interrogatories to Otterpohl that were stricken by Commissioner Griffith were actually posed in good faith and addressed issues that had been placed in dispute by opposing parties; that the respondent's failure to consult with opposing counsel prior to filing his motion to compel discovery, as required by C.R.C.P. 121, did not violate the disciplinary rules; that at least as much of the unnecessary expansion in the probate matter was caused by Scheuerman and Fisher as by the respondent, and the growth of the Otterpohl case was exacerbated by Commissioner Griffith's inexperience in contested probate matters; and that the record did not support by clear and convincing evidence that the respondent delayed the closing of the estate, or violated any disciplinary rule in that regard. The assistant disciplinary counsel has not excepted to these findings.

Colorado Springs, to wit: Jack Scheuerman, Tristan Bonn, Robert Fisher, Clifton Kruse, Michael Gross [a lawyer representing Robert Fisher in another matter], Dr. Arthur Roberts, Dr. Scott Sickbert, Commissioner E. David Griffith, the Honorable Rebecca Bromley, and the Honorable Donald E. Campbell.

The respondent also alleged the appearance of "a common scheme between [sic] Jack Scheuerman, Tristan Bonn, Clifton Kruse, Robert Fisher, Michael Gross, the Honorable Rebecca Bromley, Commissioner E. David Griffith, and the Honorable Donald E. Campbell, to oppose the petition of Kathleen Jenson for guardianship and conservatorship over her Mother's person and affairs." Moreover, the petition stated, "As offensive as Robert Fisher's role has been in this matter, it is pale in comparison to the judicial misconduct of Commissioner E. David Griffith." The board summarized the respondent's allegations concerning Commissioner Griffith "as allegations that Commissioner Griffith was orchestrating the outcome" of the proceeding.

According to the respondent's petition, Judge Campbell "appears to be attempting to conceal the misconduct of Commissioner Griffith and Judge Bromley." Also:

The order [by Judge Campbell] then affirmed all prior orders in effect in this case and ignored the judicial misconduct which is replete in this matter. The Honorable Donald E. Campbell has therefore ignored a duty he has as Chief Judge to supervise judges and commissioners who work under him, and to discipline them for misconduct.

The respondent also alleged in the petition that the "conspirators," including the judicial officers, had "commenced a campaign to slander the integrity of Kathleen Jenson, Kenneth Jenson and their family as a diversion to conceal the conspirators' misconduct."

On January 12, 1991, the respondent filed a "Motion for Recusal of the Honorable Donald E. Campbell, Motion for Recusal of the Honorable Rebecca Bromley, and Motion for Change of Venue." In it, he stated that there is an appearance of a cooperative network between [sic] Judge [sic] E. David Griffith, Judge Rebecca Bromley, Tristan Bonn, Jack Scheuerman, Clifton Kruse and Robert Fisher (who testified twice against his former client, Kathleen Jenson), which appears to have acted in concert to defeat the petition for guardianship and conservatorship over the affairs and person of Ruth Otterpohl.

In a second motion for the recusal of Judge Campbell, filed on March 28, 1991, the respondent again alleged that Judge Campbell "appears to be concealling [sic] allegations of misconduct which have been brought to Judge Campbell's attention...."

In his response to a motion from Robert Fisher to authorize the respondent to make monthly payments to Fisher, the respondent stated that

it is evident from the record that said judgment [awarding Fisher attorney fees] was entered as a result of collusion between said Honorable Donald E. Campbell and Robert S. Fisher to deny Kathleen Jenson, Kenneth Jenson and [the respondent] their civil rights (in violation of 42 USC sec. 1983) (Section 1983, of the Civil Rights Act of 1964[sic]).

The hearing board specifically found that all of the above "accusations of collusive, conspiratorial conduct, of a cover-up, of a forensic network and the like were untrue, and that [the respondent] had no basis in fact to make any of these allegations." The respondent thereby violated DR 1–102(A)(4) (a lawyer shall not engage in conduct involving dishonesty, fraud, deceit, or misrepresentation); DR 1–102(A)(5) (a lawyer shall not engage in conduct prejudicial to the administration of justice); DR 1–102(A)(6) (a lawyer shall not engage in conduct that adversely reflects on the lawyer's fitness to practice law); DR 7–102(A)(5) (in representing a client, a lawyer shall not knowingly make a false statement of law or fact); and DR 8–102(B) (a lawyer shall not knowingly make false accusations against a judge or other adjudicatory officer).

### C.

With respect to Count III, a majority of the hearing board found that only one allega-

tion had been established.[2] In a counterclaim he filed against Fisher, the respondent alleged that Fisher had perjured himself in testimony during the probate proceeding. Fisher testified at the disciplinary hearing that he did not perjure himself and had no idea what the respondent's allegation referred to. At the hearing, the respondent testified that he could not then recall what the perjury charge was based on, although he speculated that Fisher's testimony in the probate proceeding conflicted with what he told the Jensons on other occasions. A majority of the hearing board concluded that "[t]he credibility of [the respondent] on this point was assessed by two members of the Hearing Board to be very poor, especially when taken in the context of [the respondent's] numerous other false and groundless accusations against others whom he perceived to be antagonistic to his clients."[3]

### III.

Two members of the hearing board recommended that the respondent be suspended for two years. The presiding officer recommended that the respondent be disbarred, as did the hearing panel. The respondent excepted to the panel's action, maintaining that no discipline was appropriate. A number of factors persuade us that disbarment is warranted.

2. A majority of the board determined that a number of the allegations contained in Count III of the complaint had not been proven by clear and convincing evidence, and, moreover: that the respondent's initial assertion in a counterclaim that Fisher had stipulated to the issuance of a temporary restraining order without his client's consent was based on an honest mistake that was soon rectified and did not constitute misconduct; the respondent's charge that Fisher had provided opposing counsel with confidential attorney-client information was based on "information and belief" and did not violate a disciplinary rule; that the respondent had not actually alleged either that Fisher had failed to use police reports to challenge Karen Constantini's credibility, or that Fisher testified without his former client's consent on her motion for continuance; and that the respondent's filing of a legal malpractice claim against Fisher in the probate court did not violate any disciplinary rule.

3. The hearing board did not specify what disciplinary rule or rules this false charge of perjury violated. Count III of the complaint alleged that

Were this the first time that the respondent had engaged in this type of misconduct, a period of suspension might be appropriate. See ABA *Standards for Imposing Lawyer Sanctions* 6.12 (1991 & Supp.1992) (ABA *Standards*) ("[s]uspension is generally appropriate when a lawyer knows that false statements or documents are being submitted to the court ... and takes no remedial action, and causes injury or potential injury to a party to the legal proceeding, or causes an adverse or potentially adverse effect on the legal proceeding."); ABA *Standards* 7.2 ("[s]uspension is generally appropriate when a lawyer knowingly engages in conduct that is a violation of a duty owed as a professional and causes injury or potential injury to a client, the public, or the legal system.").

The respondent, however, has engaged in such conduct before, and has been suspended for it, with no apparent effect on his subsequent behavior. In *People v. Bottinelli*, 782 P.2d 746 (Colo.1989), this same respondent was suspended for six months for similar misconduct. The respondent falsely represented in pleadings to a district court and in a letter to the grievance committee that a lawyer on the opposing side in a civil case had withdrawn because of a conflict of interest. *Id.* at 751. He also misrepresented facts in a pleading by charging that an opposing lawyer had assaulted him and had stolen documents from him, when he knew

the respondent had violated DR 1–102(A)(4) (conduct involving dishonesty, fraud, deceit, or misrepresentation); DR 1–102(A)(5) (conduct prejudicial to the administration of justice); DR 1–102(A)(6) (conduct adversely reflecting on fitness to practice); DR 7–102(A)(1) (in representing a client, a lawyer shall not file a suit, assert a position, conduct a defense, delay a trial, or take other action on behalf of the lawyer's client when the lawyer knows or when it is obvious that such action would serve merely to harass or maliciously injure another); and DR 7–102(A)(5) (in representing a client, a lawyer shall not knowingly make a false statement of law or fact). These disciplinary violations pertain to all of the allegations contained in Count III, however, including the allegations that the hearing board found were not proven. Nevertheless, the factual findings of the majority of the board support the conclusion that the respondent's false charge of perjury violated all of the above disciplinary rules.

that the charges were not true. *Id.* He also attempted to acquire information about an opposing party's sexual conduct, religious habits, and personal acquaintances through two sets of interrogatories, and, after the trial court had ruled that such issues were not relevant, he filed two affidavits alluding to the other party's personal relationships and alleged promiscuity. *Id.* at 748–49, 751.

The similarities between the misconduct that was the subject of the two disciplinary proceedings are striking. Following the six-month suspension, and less than three months after being reinstated to the practice of law on June 5, 1990, the respondent entered his appearance in the *Otterpohl* probate matter. ABA *Standards* 8.1(b) provides that, in the absence of mitigating circumstances, disbarment is appropriate when a lawyer "has been suspended for the same or similar misconduct, and intentionally or knowingly engages in further acts of misconduct that cause injury or potential injury to a client, the public, the legal system, or the profession." *See People v. Redman,* 902 P.2d 839, 840 (Colo.1995) (unauthorized practice of law during suspension imposed as discipline for accepting a retainer while under administrative suspension warrants disbarment); *People v. Dolan,* 873 P.2d 766, 769 (Colo. 1994) (lawyer's continuing pattern of misconduct following two prior suspensions and multiple private discipline demonstrated futility of ordering another suspension, so disbarment was appropriate); *People v. Regan,* 871 P.2d 1184, 1188 (Colo.1994) (had lawyer engaged in the present misconduct after earlier-imposed discipline for similar misconduct, disbarment would be warranted).

Mitigating circumstances do not call for any sanction less than disbarment in this case. The board found that the respondent did not profit financially from his involvement in the *Otterpohl* case. Two members of the board determined that the respondent was acting without a selfish motive. *Id.* at 9.22(b) (absence of a selfish motive is a mitigating factor). As set forth in the hearing board's findings and recommendation,

> [the same] two members note[d] that this case involved a high level of hostility and animosity on everyone's part and that

many of [the respondent's] actions were responsive in nature. They further note[d] that the breakdown in the relationship between the parties was not initiated by [the respondent] but was already in existence prior to his entry in the case.

*But see Bottinelli,* 782 P.2d at 751–52 ("While extreme antagonism and bitterness among the parties and all attorneys marked the progress of these cases, such hostile atmosphere cannot justify respondent's flagrant and repeated violations of the Code [of Professional Responsibility].").

Also, the factors in aggravation are substantial. The respondent has a prior disciplinary record, *id.* at 9.22(a); there is a pattern of misconduct, *id.* at 9.22(c); the misconduct involves multiple offenses, *id.* at 9.22(d); the respondent has engaged in a bad faith obstruction of the disciplinary proceeding by intentionally failing to comply with the rules or orders of the disciplinary authorities, *id.* at 9.22(e); he has wholly refused to acknowledge the wrongful nature of his conduct, *id.* at 9.22(g); the victims were vulnerable, *id.* at 9.22(h); and the respondent has substantial experience in the practice of law, *id.* at 9.22(i).

Concerning the aggravating factors, the board also found

> that on numerous occasions [the respondent] acted in bad faith to obstruct these disciplinary proceedings by failing to comply with orders of the Hearing Board, including repeatedly asserting defenses previously stricken by the presiding officer, by re-endorsing witnesses previously stricken, and by filing several motions to recuse Hearing Board members containing false or groundless accusations. Throughout these proceedings [the respondent] repeatedly made false and groundless allegations of conspiratorial conduct by members of the Grievance Committee, the State Court Administrator, and members of the Supreme Court....
>
> The Hearing Board finds that [the respondent] refused to acknowledge the wrongful nature of his conduct. During his final argument [the respondent] stated to the Hearing Board that he was totally at

peace with what he did in this case, and that he felt good about what he did.

Our own experience with the respondent's conduct before this court tends to reinforce the hearing board's findings. In the motions and the briefs the respondent filed in this court, he once again reasserts his conspiracy theories involving the numerous persons the respondent believes oppose him, and he argues that no discipline whatever is appropriate in this case. We reject the respondent's contentions. His continuing misconduct reinforces our conclusion that disbarment is the only appropriate outcome. We therefore accept the hearing panel's recommendation.

### IV.

It is hereby ordered that Gary Alan Bottinelli be disbarred and that his name be stricken from the list of attorneys authorized to practice before this court, effective thirty days after the issuance of this opinion. It is further ordered that the respondent pay the costs of this proceeding in the amount of $8,881.63 to the Supreme Court Grievance Committee, 600 Seventeenth Street, Suite 920–S, Denver, Colorado 80202, within ninety days after the announcement of this opinion.

VOLLACK, C.J., does not participate.